STATE OF OKLAHOMA ex rel. STATE BANKING BOARD and Harry Leonard, State Bank Commissioner and Chairman, State Banking Board, Plaintiffs,

v.

BANK OF OKLAHOMA, Defendant.

STATE OF OKLAHOMA ex rel. STATE BANKING BOARD and Harry Leonard, State Bank Commissioner and Chairman, State Banking Board, Plaintiffs,

v.

UTICA NATIONAL BANK, Defendant,

James E. Smith, Comptroller of Currency of United States of America, Party-Defendant.

Nos. 75–C–319, 75–C–318.

United States District Court, N. D. Oklahoma.

Dec. 23, 1975.

Todd Markum, Asst. Atty. Gen., and James Robinson, Oklahoma City, Okl., for plaintiffs.

R. L. Davidson, Jr., and James S. Boese, Tulsa, Okl., for defendant Bank of Oklahoma.

William C. Anderson and Stephanie Seymour, Tulsa, Okl., for defendant Utica National Bank.

Edward Jiran and James V. Elliott, Washington, D. C., for James E. Smith.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARROW, Chief Judge.

These consolidated cases come on for decision this 23rd day of December, 1975.

By way of background, it should be remembered that on August 14, 1975, the Court conducted an evidentiary hearing in Case No. 75–C–319 on plaintiff's Motion for Temporary Restraining Or-

der, during the course of which the Court, on its own motion, personally visited and saw in actual operation the defendant Bank of Oklahoma's CBCT located in the Resource Sciences Corporation parking lot at 6700 South Yale Avenue in the City of Tulsa, Oklahoma. At the same time, the Court viewed, but did not see in actual operation, a 24-hour RSU teller machine, similar to Bank of Oklahoma's CBCT, which Tulsa Federal Savings and Loan Association has installed in the outside wall of Froug's Department Store in Southland Shopping Center, also in the City of Tulsa. At the conclusion of said hearing, the *Motion for Temporary Restraining Order* was denied.

Thereafter by agreement of the parties, Case No. 75–C–319 was consolidated with Case No. 75–C–318. Also by agreement of the parties, and particularly with the agreement of the defendant, Utica Bank and Trust Company (hereinafter "Utica"), all evidence taken at the hearing of August 14 in Case No. 75–C–319 was deemed applicable to the plaintiff's Motion for Temporary Restraining Order pending in Case No. 75–C–318. Subsequently, the Court, again on its own motion, personally visited and viewed, and saw in actual operation, Utica's CBCT located at the Clarke's Good Clothes retail store in Southland Shopping Center in the City of Tulsa. On October 1, 1975, the Motion for Temporary Restraining Order in Case No. 75–C–318 was also denied.

On October 30, 1975, the Court entered its Order dismissing the Independent Bankers Association of Oklahoma as an intervening plaintiff, in both cases, for lack of standing.

The consolidated cases came on for trial on the merits on November 11, 1975. The Court, during four days of trial, heard the arguments and statement of counsel, the testimony of various witnesses called by the parties and examined under oath; and saw and examined the documentary evidence adduced in connection therewith. The Court has reviewed the pleadings and briefs on file

herein, the lengthy Pretrial Order and Stipulations of the parties contained therein, and has examined the depositions (with attached exhibits) of various and sundry witnesses, which were admitted in evidence by agreement of all parties. The parties have prepared and submitted lengthy proposed findings of fact and conclusions of law which have been considered and studied at length by the Court.

Being thus fully advised in the premises, the Court makes the findings of fact and conclusions of law hereinafter set forth. With respect to its findings of fact, the Court has attempted to make references to portions of the voluminous transcript and record which it deems to be particularly noteworthy. However, the Court credited much other testimony and evidence in making its findings, and its specific references are not intended to be all inclusive.

## DEFINITION OF TERMS

For the sake of clarity and brevity, the following terms used within these findings and conclusions shall be abbreviated and have the meanings as set forth below.

1. *EFTS*—electronic funds transfer systems.
2. *CBCT*—customer-bank communication terminals, including any off-premises electronic device either manned or unmanned (but not employing bank personnel) activated by a bank customer to communicate instructions to his bank regarding the transfer of funds to and from his bank accounts.
3. *POS*—point of sale terminal; a type of manned CBCT.
4. *ATM*—automated teller machine; a type of unmanned CBCT.
5. *RSU*—remote service unit; the equivalent of CBCTs for savings and loan associations.
6. *THRIFT INSTITUTIONS*—financial depository institutions including savings and loan associations and credit unions.

7. *Tr.*—Transcript of trial proceedings and page number thereof.

8. *Dep.*—Deposition of a named individual and page number thereof.

9. *Stip.*—Stipulation of fact as contained in the Pretrial Order filed of record in these consolidated causes, including the paragraph number thereof.

## IDENTIFICATION OF WITNESSES

The following individuals, who testified in person or by deposition, or both, in the trial of these cases will sometimes be referenced to in these findings and conclusions by their surnames, as follows:

1. *Leonard*—H. E. Leonard, Plaintiff and State Bank Commissioner, who by statute is vested with supervisory authority over state chartered banks, savings and loan associations, trust companies, credit unions, and perpetual cemeteries.

2. *Killmon*—Richard L. Killmon, Vice President and Director of the Banking Services Department, Fidelity Bank, N.A., Oklahoma City, Oklahoma.

3. *Eaton*—Leonard J. Eaton, Jr., President of defendant, Bank of Oklahoma, N.A., Tulsa, Oklahoma.

4. *Davis*—John Davis, Planning Officer of defendant, Bank of Oklahoma, N.A., Tulsa, Oklahoma.

5. *Thompson*—V. M. Thompson, Jr., President and Chief Executive Officer of defendant, Utica National Bank and Trust Company, Tulsa Oklahoma, Director, Oklahoma City Branch, Federal Reserve Bank of Kansas City.

6. *Laskey*—O. C. Laskey, Vice President of defendant, Utica National Bank and Trust Company, Tulsa, Oklahoma.

7. *Ingle*—Donald E. Ingle, President and Chief Executive Officer, Tulsa Federal Savings and Loan Association, Tulsa, Oklahoma.

8. *Waller*—William M. Waller, President State Federal Savings and Loan Association, Tulsa, Oklahoma.

9. *Amis*—R. S. Amis, President of the Independent Bankers Association of Oklahoma, Midwest City, Oklahoma.

10. *Hanna*—John Hanna, President, City Bank of Muskogee, Muskogee, Oklahoma.

11. *Wade*—Pryor Wade, President, First Farmers National Bank, Waurika, Oklahoma, and Chairman of the Board, First State Bank, Temple, Oklahoma.

12. *Jacobs*—Donald P. Jacobs, Dean of the Graduate School of Management, Northwestern University, Evanston, Illinois.

13. *McKinney*—Wesley R. McKinney, Chairman of the Board and Chief Executive Officer, Republic Bank and Trust Company, Tulsa, Oklahoma.

14. *Browne*—Russell C. Browne, Advisor to Comptroller of the Currency for Payment Systems (Policy Planning) and the Comptroller's Representative to the National Electronic Funds Transfers Commission, Washington, D. C.

15. *Tucker*—Morrison G. Tucker, Chief Executive Officer and/or Director of five state chartered banks, Oklahoma City, Oklahoma, and recent past president of the Oklahoma Bankers Association.

## STATUTES INVOLVED

The following federal statutes involved in these consolidated cases are 12 U.S.C. § 36(c), (f) and (h), and § 24 Seventh, which provide in pertinent part:

"§ 36. Branch banks

The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following:

\* \* \* \* \* \*

"(c) A national banking association may, with the approval of the Comp-

troller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

\* \* \* \* \* \*

"(f) The term 'branch' as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business located in any State or Territory of the United States or in the District of Columbia at which deposits are received, or checks paid, or money lent.

\* \* \* \* \* \*

"(h) The words 'State bank,' 'State banks,' 'bank,' or 'banks,' as used in this section, shall be held to include trust companies, savings banks, or other such corporations or institutions carrying on the banking business under the authority of State laws."

"§ 24. Corporate powers of associations

Seventh. To exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; . . ."

The state statutes involved are 6 Okl. St.Ann. §§ 415, 501, 1001 and 2061, which provide in pertinent part:

"§ 415. Drive-in, walk-up facility

A. Drive-in or walk-up service authorized. Any bank chartered under the laws of this state may, subject to the approval of the Board as evidenced by its certificate, maintain and operate outside attached facilities and one detached facility having one or more tellers' windows for drive-in or walk-up service or both on property owned or leased by the bank located less than one thousand (1,000) feet from the center of the street abutting the bank's main building at that part of said bank's main building in the direction towards the center of the street abutting the nearer part of the structure housing the said outside facility.

B. Certificate to maintain additional outside facilities—Notice and hearing—Injunction of prohibited activities

\* \* \* \* \* \*

(3) Any banking function may be performed at the facility save that of making loans. Upon the recommendation of the Commissioner, the Attorney General shall bring an appropriate action to enjoin a bank from conducting the making of loans at such facility."

"§ 501. Branch banking prohibited

Branch banking is prohibited in this state. The term 'Branch' used in this section shall be held to include any branch bank, branch office, branch agency, additional office or any branch place of business located within this state at which deposits are received, or checks paid or money lent. This section shall not be construed in derogation or denial of the right to operate and maintain facilities as provided in Section 415 or Section 421 of this Code."

"§ 1001. Powers of trust companies

A. All corporate trust companies now existing or hereafter created shall have the following powers:

(1) To receive deposits of trust moneys; to receive upon deposit for safekeeping personal property of every description; to guarantee special deposits; and to own or control safety vaults and rent the boxes therein.

(2) To accept and execute all such trusts and perform such duties of every description as may be committed to them by any person or persons whatsoever, or any corporation, and act as assignee, receiver, trustee and depository, and to accept and execute all such trusts and perform such duties of every description as may be committed or transferred to them by order, judgment or decree of any of the courts of record of this state or of any state or of the United States.

(3) To take, accept and hold by the order, judgment or decree of any court of this state, or of any state or territory of the United States, or by gift, grant, assignment, transfer, devise or bequest of any person or corporation, any real or personal property in trust, and to execute and perform any and all such legal and lawful trusts in regard to the same upon the terms, conditions, limitations and restrictions which may be declared, imposed, established or agreed upon in and by such order, judgment, decree, gift, grant, assignment, transfer, devise or bequest, and to execute as principal or surety, and to guarantee against loss any principal or surety upon any bond or bonds required by law to be given in any proceeding in law or equity in any of the courts of this state or of any state or of the United States.

(4) To act as agent or attorney in fact for any person or corporation in the management and control of real or personal property and the sale or conveyance of the same, and for the investment of money, and to act for and represent corporations or persons under power and letters of attorney, and as agents for persons and corporations for the purpose of issuing, registering, transferring or countersigning the certificates of stock, bonds or other evidences of debt of any corporation, association, municipality, state or public authority, on such terms as may be agreed upon.

(5) To accept from and execute trusts for married persons in respect to their separate property, whether real or personal, and act as agent for them in the management of such property, and generally to have and exercise such powers as are usually had and exercised by trust companies.

(6) To act as executor under last will or at the instance of any person entitled to any administration or guardianship of any estate, as administrator of the estate of any deceased person, or as guardian or curator of any infant, insane person, idiot or habitual drunkard, or trustee for any convict in the penitentiary under the appointment of any court of record having jurisdiction of the person or estate of such deceased person, infant, insane person, idiot, habitual drunkard or convict.

(7) To guarantee the fidelity and diligent performance of their duty of persons or corporations holding places of public or private trust, to guarantee or become surety on any bond given by any person or corporation and to reinsure or guarantee any person or corporation against loss or damage by reason of any risk assumed by insuring the fidelity or diligent performance of duty of any such person or corporation, or by guaranteeing or becoming surety on any bond; and to guarantee the principal or interest, or both, of any securities of any kind.

(8) To loan money upon real estate and collateral security, and execute and issue its notes payable at a future date, and to pledge its mortgages on real estate and other securities as security therefor, which notes may be issued to an amount not exceeding, in the aggregate, ten times the amount paid up on the capital stock of the company issuing the same, and shall in no case exceed the amount of the first mortgages pledged to secure their payment.

(9) To buy and sell the bonds and warrants of this state, and all other kinds of government, state or municipal bonds; and to buy and sell all kinds of negotiable and nonnegotiable paper, stocks and other investment securities.

(10) To act as fiscal agent of the United States, or any state, municipality, body politic or corporation, and in such capacity to receive and disburse money, credits, securities and effects.

(11) To act as trustee under trusts created by will or by declaration of trust.

(12) To act as guardian for any number of persons.

(13) To transfer, register and countersign certificates of stock, bonds, or other evidence of indebtedness, and to act as agent of any corporation, foreign or domestic, for any purpose now or hereafter required by statute or otherwise.

(14) To act as trustee under any mortgage or bond issued by any municipality, body politic or corporation, and to accept and execute any other municipal or corporate trust not inconsistent with the laws of this state.

(15) To take, accept and execute any and all such legal trusts, duties and powers in regard to the holding, management and disposition of any estate, real or personal, and the rents and profits thereof, or the sale thereof, as may be granted or confided to it by any court of record, or by any person, corporation, municipal or other authority, and it shall be accountable to all parties in interest for the faithful discharge of every such trust, duty or power which it may so accept.

(16) To be appointed and accept the appointment of assignee or trustee under any assignment for the benefit of creditors of any debtor made pursuant to any statute or otherwise.

(17) To collect coupons on or interest upon all manner of securities when authorized so to do by the parties depositing the same.

(18) To receive and manage any sinking fund of any corporation upon such terms as may be agreed upon between said corporations and those dealing with it.

(19) Generally to execute trusts of every description and escrow agreements and to act and serve in any and all fiduciary capacities not inconsistent with the laws of this state, or of the United States.

(20) To prepare, make and certify abstracts of title to real and personal property and to procure and furnish information in relation thereto, where not otherwise inconsistent with the laws of this state; to guarantee or insure the title to real and personal property to persons interested in such property or in mortgages thereon, against loss, by reason of defective title or other encumbrances of or upon such property, and to make determination of title in connection with the issuance of such guaranties or insurance.

(21) To discount and negotiate promissory notes, drafts, bills of exchange and other evidence of debt, buy and sell coin and bullion, to accept for payment at a future date drafts drawn upon it by its customers, and to issue letters of credit, authorizing the holders thereof to draw drafts upon it or upon its correspondents at sight or on time not exceeding one year; provided that no trust company shall incur liabilities under this subdivision to an amount equal at any time in the aggregate to more than its paid-up and unimpaired capital stock and surplus fund, except with the approval of the Bank Commissioner under such general regulations as to amount of acceptances as the Commissioner may prescribe.

(22) To issue debentures, notes, or other evidences of debt in the manner in which business corporations are authorized to do so and for any legal application of proceeds, but only to the extent of an amount equal to ten times its capital and surplus."

"§ 2601. Branch banking prohibited—Definition—Drive-in or walk-up service authorized

Branch Banking is prohibited in this State. The term 'Branch' used in this Section shall be held to include any branch bank, branch office, branch agency, additional office or any branch

place of business located within this State at which deposits are received, or checks paid or money lent. Provided, however, that any bank chartered under the laws of this State may, subject to the approval of the State Bank Commissioner as evidenced by his permit, maintain and operate only one outside attached or detached facility having one or more teller's windows for drive-in or walk-up service or both on property owned or leased by the bank located less than one thousand (1,000) feet from the main bank building."

## FINDINGS OF FACT APPLICABLE TO OPERATION OF UTICA NATIONAL BANK AND TRUST COMPANY

1. Utica has at all times pertinent to these actions owned and operated two CBCTs, located in Southland Shopping Center, within the City limits of Tulsa, approximately four and one-half miles from the chartered banking house of Utica. The plaintiff Bank Commissioner was advised, in May of 1975, that certain national banks doing business in Oklahoma intended to install and activate such CBCTs on or about July 1, 1975. Utica's President and Chief Executive Officer advised the plaintiff Bank Commissioner at a meeting in mid-June of 1975 of Utica's intention to install and activate its CBCTs by July 1, and confirmed this intention by letter to the Bank Commissioner dated June 26, 1975. Utica activated its CBCTs on July 1 at a location in a retail store owned by TG & Y Stores Co. in the aforementioned Southland Shopping Center. They were operated at that location until July 7. Utica then moved its CBCTs to their present location at the retail store owned by Clarke's Good Clothes, Inc. (hereinafter "Clarke's"), in the same shopping center, approximately 200 feet from the TG & Y store where they had originally been located. The CBCTs were activated on July 16, 1975, and the plaintiff Bank Commissioner so notified by Utica's letter of the same date. However, the plaintiff Bank Commissioner had, by this time, decided to try to prevent operation of such devices by commercial banks (although not by state chartered savings and loan associations) and had written his letter of July 14 notifying Utica not to proceed with opening of its CBCT facilities. Thereafter Case No. 75–C–318 was filed on July 18. References hereinafter to operation of the terminals at Clarke's shall also apply to and embrace operation of the terminals at their former location at TG & Y, inasmuch as the procedures for operating the terminals were and are the same at both locations and the written agreements respecting operation of the terminals between Utica and TG & Y, and between Utica and Clarke's, are the same. (Stip. ¶¶ 1–8; Thompson Dep. at 34–35 and Exhs. 1 and 2 thereto.)

2. The plaintiff Bank Commissioner testified and the Court finds that many banks in Oklahoma, both state and national, do not have their own computer located on premises, but instead utilize an off-premises computer on a time-sharing basis in conjunction with other financial institutions. The Bank Commissioner further testified that he approves of this practice and has no objection to it; that it is of no significance to him insofar as this litigation is concerned whether Utica has its own on-premises computer or utilizes an off-premises computer. Since the matter is uncontested, the Court will deem all functions performed by Utica's computer in connection with the terminals as having been performed on and at the premises of Utica's chartered banking house, the same as if Utica maintained its own computer on and at its said premises. (Tr. at 386–387).

3. Utica's CBCTs, being located in retail stores, are commonly referred to as "point-of-sale" or "P.O.S." units. They are "on-line"; i. e., connected directly to Utica's main banking computer by telephone lines. (Stip. ¶ 2).

4. The plaintiff Bank Commissioner has admitted that he does not object to use of Utica's CBCTs for pure point of sale transactions, i. e., withdrawals to

pay for merchandise purchased from Clarke's. (Tr. at 31, 399).

5. Utilizing Utica's CBCTs, a Utica customer may initiate a deposit to his Utica checking account, or a withdrawal from his Utica checking account (either for the purpose of purchasing merchandise from Clarke's, or for other purposes). Additionally, if the Utica customer has no funds in his checking account, but has a prearranged line of overdraft checking credit with Utica, known as a "Uticash" account, he may initiate a withdrawal from his checking account which is funded by a disbursement of funds pursuant to the prearranged line of overdraft checking credit. (Stip. ¶¶ 14, 15).

6. Pursuant to stipulation, the Court finds that all banking transactions, as outlined above, which are initiated by instructions transmitted by Utica customers through CBCTs located at Clarke's, are instantaneously consummated in Utica's computer. (Stip. ¶ 13).

7. The Court finds that the aforementioned banking transactions, including deposits, withdrawals, and withdrawals funded by Uticash, do not take place at the location of the terminal, i. e., Clarke's, but take place on Utica's premises in its computer. (Stip. ¶¶ 13, 16; Tr. at 74, 187–188, 234–236, 284, 299–301, 498).

8. The evidence shows that it is customary and general practice among state and national banks in the City of Tulsa and State of Oklahoma for a bank officer to honor and carry out telephone instructions received by him at the bank from a bank customer, so long as the bank officer recognizes the voice of the customer, including, in particular, instructions to transfer funds from the telephoning customer's account to the account of another customer. (Stip. ¶¶ 22, 36; Leonard Dep. at 86–87, 107–108; Tr. at 123, 143, 274–275, 397–398).

9. The plaintiff Bank Commissioner has admitted that if any telephone could be utilized to transmit instructions to Utica's computer, as are Utica's termi-nals, such telephones would not be branches of Utica. However, the Court finds that the terminals located at Clarke's perform the same basic function as an ordinary telephone, i. e., a method for transmitting instructions of a customer to his bank. The only difference is that the instructions are received and acted upon by the bank's computer rather than a bank officer or employee. In both instances the instructions are acted upon at the bank premises. (Leonard Dep. at 93–94, 108, 110–114; Tr. at 165–168, 195–197, 284, 388–391).

10. The Utica operation is virtually identical to and is patterned upon the system operated in the State of Nebraska by First Federal Savings and Loan Association of Lincoln, Lincoln, Nebraska, and Hinky Dinky Stores. (Tr. at 492).

11. For the purpose of utilizing the terminals, Utica customers are issued a coded plastic card, called a "Utica Card", and a confidential three-digit identification number. (Stip. ¶ 9).

12. Based upon the stipulations of the parties and the evidence, the Court finds that utilizing his coded plastic card and confidential three-digit number, a Utica customer may initiate the banking transactions referred to in paragraph 5 above, in the following manner (to facilitate the transactions Clarke's also maintains a checking account with Utica):

a) *Withdrawals*: Upon execution of the requisite form, the customer's Utica Card is inserted into the terminal, along with the form. The customer then selects his personal three-digit code number on the terminal keyboard, which number is maintained in Utica's computer and assigned to the customer's bank account. A "process" button on the terminal is then depressed, which causes the terminal to transmit the particulars of the proposed transaction to Utica's computer. Upon receipt of such instructions and information, Utica's computer first verifies the identity of the customer and customer account, and further verifies that the customer has the nec-

essary funds (or prearranged overdraft credit) in his checking account. If the computer authorizes the transaction after such verification, the transaction is immediately completed and consummated in the computer, by a simultaneous debit of the customer's account and a like credit to Clarke's account. Thereafter, the computer transmits a signal back to the terminal that the transaction has been approved and consummated. Clarke's then disburses its cash to the customer, out of its cash drawer, in the amount of the withdrawal.

b) *Deposits*: The deposit procedure is essentially the reverse of the withdrawal transaction, except that the customer tenders funds to Clarke's along with the requisite form. After the proposed transaction is transmitted by the terminal to the computer, and after computer verification and approval of the transaction, it is immediately completed and consummated in the computer by a simultaneous debit of Clarke's account and a like credit to the bank customer's account. Thereafter, the computer transmits a signal to the terminal that the transaction has been approved and consummated. Clarke's then accepts the tendered funds, which become its property and are placed in its cash drawer. (Stip. ¶ 11; Defendant Utica's Exh. 4).

13. In a withdrawal transaction initiated via the terminals as described in paragraph 12 above, all currency or merchandise delivered by Clarke's to Utica customers is, and has been at all times prior thereto, the property of Clarke's, and thereafter becomes the property of the Utica customer. Such currency or merchandise is at no time the property of Utica. (Stip. ¶ 16).

14. In a deposit transaction initiated via the CBCT as described in paragraph 12 above, all currency or checks physically tendered by Utica customers to Clarke's belongs first to the Utica customer and then to Clarke's and Clarke's is under no obligation whatsoever to deliver said currency or checks to Utica. Such currency or checks are at no time the property of Utica. (Stip. ¶ 16).

15. The transfer of funds from the account of a Utica customer to the account of Clarke's, or vice versa, as referred to in paragraph 12 above, constitutes a transfer of funds which takes place solely on the premises of Utica's banking house. These funds are separate and distinct from the funds belonging to Clarke's or the Utica customer which are exchanged at Clarke's premises. (Stip. ¶¶ 13, 16; Tr. at 74–75, 95–96, 187–188, 196–197, 234–236, 299–301, 431–432, 498).

16. A casualty (fire, windstorm, etc.) or theft loss occurring to currency or checks received by Clarke's at the Clarke's store from a Utica customer, or maintained by Clarke's for disbursement, as described in paragraph 12 above, is the loss of Clarke's and not the loss of Utica. Utica does not insure or provide Clarke's with insurance against this risk of loss. Under paragraph 8 of Utica's agreement with Clarke's (Defendant Utica Exh. 4), Utica does indemnify Clarke's against fraud, fraudulent misuse of a Utica card, or errors of a Clarke's employee, if the same results in an erroneous transaction sent by the remote terminal to Utica's computer and consummated at the computer; however, Utica does not indemnify Clarke's against theft by a Clarke's employee of cash or checks out of Clarke's cash drawer in a situation where there has been no transaction sent via the terminals to the Utica computer and consummated at the computer. (Stip. ¶ 16; Thompson Dep. at 55–56; Tr. at 69–71, 93–94, 497, 519–520).

17. Clarke's has complete dominion, control and right of control over the area in its store where the Utica CBCTs are located, and over the CBCTs themselves while in operation in its store. (Stip. ¶¶ 8, 17, 18).

18. Except for a brief instructional period prior to commencement of operation of the CBCTs Utica employees have not worked on, in or about the Clarke's store area where the terminals are locat-

ed, and Utica employees do not assist customers in the use of the terminals. (Stip. ¶ 17).

19. Utica employees do not visit the location of the terminals at Clarke's for the purpose of replenishing supplies of cash or currency, for the purpose of picking up or receipting for cash or currency, nor for any other purpose pertaining to operation of the terminals. (Stip. ¶¶ 16, 17).

20. Under its agreement with Clarke's, no fees or other considerations are paid by Utica to Clarke's, or vice versa. (Stip. ¶ 21).

21. There are no signs or other indicia at the Clarke's store indicating any reference to Utica other than one sign with dimensions of approximately 16 by 30 inches, which states "Use your Utica Card here." (Tr. at 497).

22. Utica has not and does not hold out to its customers nor has it taken any action, by advertising or otherwise, tending to hold out to the community at large that the location of the terminals at Clarke's Good Clothes is a Utica agency, instrumentality, branch, or the like. (Stip. ¶ 19; Tr. 497).

### FINDINGS OF FACT APPLICABLE TO OPERATION OF BANK OF OKLAHOMA, N.A.

23. The CBCT of Defendant, Bank of Oklahoma, N.A., is located at approximately 67th and Yale in the City of Tulsa, State of Oklahoma, some 10 miles from its chartered banking house. By letter dated June 2, 1975, the Bank notified the Comptroller of the Currency of its intent to install and operate this CBCT. The Bank began operation of the CBCT on or about July 11, 1975, has operated continuously since that date, and is operating at the present time. On or about June 23, 1975, the Bank Commissioner met with officers of Bank of Oklahoma and discussed the Bank's prospective CBCT operations. On or about July 14, 1975, plaintiff Bank Commissioner ordered the Bank to cease and desist the operation of this CBCT. The

Bank has declined to comply with this Order. (Stip. ¶¶ 31, 38–40; Tr. 318).

24. The CBCT is a Mosler automated teller machine (ATM), free-standing, unmanned, and off-line (not presently connected directly to the computer of the defendant, Bank of Oklahoma, N.A., by telephone or direct line). Said CBCT is activated for use by the insertion of a plastic card, magnetically encoded with machine-readable data related to the holder-user's accounts, and the entering of a secret personal identification number of four digits by means of a digital keyboard on the machine. Such CBCT may be so activated by two types of cards, i. e., Master Charge Cards and Transfund Cards. The Master Charge Card is an interbank card issued through Bank of Oklahoma, N.A., and usable by the holder thereof generally for the obtaining of cash, purchase of goods or services throughout the United States at participating banks or merchants. The Transfund Card is issued by Bank of Oklahoma to checking and savings account customers only, and may be used only for the purpose of communicating instructions to that bank pertaining to such accounts. When fully activated, the following transactions may thereupon be initiated by such a card holder:

a) Transfer of funds from that customer's checking account to the same customer's savings account or master charge account.

b) Transfer of funds from that customer's account to the same customer's checking or master charge account.

c) Transfer of funds from that customer's master charge account to the same customer's checking account.

d) Obtain cash advance not to exceed $200.00, in increments of $20 from the card-holding customer's checking account, savings account, or master charge account. In this connection, the CBCT does not and is incapable of advancing funds in odd amounts, or in any amount other than $20 increments. By different programming the increment may be

changed, but in all cases would be a fixed and predetermined amount or multiples of a predetermined, fixed amount.

e) Initiate a deposit to checking or savings account of the same customer by inserting cash, checks or other commercial items into a repository or deposit slot in the face of the machine and by using the appropriate button, record the instruction as to what account such intended deposit is to be credited and declaring the amount thereof.

f) Initiate bill payments by inserting invoices, bill stubs, or other written instruction into the deposit slot, depressing the appropriate key, and then by use of the digital keyboard declaring the appropriate total amount and designating from what account, i. e., checking, savings, or master charge, against which the bill payments are to be debited.

g) With respect to all such transactions, the instructions of the customer are recorded on machine-readable punch tape or magnetic tape within the CBCT. The CBCT is serviced on a daily basis and the roll of tape bearing the instructions is removed and taken to the chartered banking premises of the defendant, Bank of Oklahoma, where it is decoded or machine-read by employees of the Bank of Oklahoma and the instructions carried out by making the appropriate debits or credits in compliance with such instructions.

h) The CBCT at the conclusion of a customer's transactions, issues a memorandum which is a copy of the customer's instructions as recorded on the tape within the machine.
(Stip. ¶¶ 32–35; Eaton Dep. at 7–8, 9–10, 13; Tr. at 542–544, 547–549).

25. No customer (card holder) may obtain an advance of cash from Bank of Oklahoma's CBCT unless there exists at the time a prearranged line of credit in

the form of either (a) Master Charge account, (b) Master Reserve Account, or (c) demand deposit account contract. The contracts establishing each of these accounts make provision for overdraft privileges. Both overdraft privileges and prearranged lines of credit are negotiated, agreed upon, and signed at the chartered banking premises.[1] (Tr. at 531–533)

26. The Court further finds from the evidence that upon the insertion into the CBCT of cash, checks, or other commercial items, the defendant Bank of Oklahoma has no means of knowing or verifying the accuracy of the amount declared, or whether any such items were, in fact inserted until such items are actually received at the chartered banking house and verified; that until such cash is actually received at the banking house and verified, the defendant Bank of Oklahoma has no use of the funds and such funds until verified and credited to the account of the customer are not available to nor subject to withdrawals by that customer; that with respect to checks or other commercial items inserted into the CBCT as an intended deposit, the Bank is not aware and has no means of knowing the genuineness of the items, or whether they represent good funds until they have been received at the banking house and processed for collection. That in the collection process, until third party checks so delivered as an intended deposit are physically received at the banking house and examined, the Bank is unable to make a judgment as to whether provisional credit will be given to the account of the customer or whether credit will be withheld until the item is actually collected; and that the foregoing is applicable in every instance to the insertion of cash, checks and other commercial items into the United States mail. The Court, therefore, finds that the Bank of Oklahoma CBCT is merely a receptacle of such items just as a mailbox. (Tr. at 187–188, 234–236, 238–239,

---

1. The Court takes notice of the fact that advances of credit upon Master Charge and similar credit card accounts do not accrue interest

charges if repaid during the subsequent billing period.

282–283, 299–301, 333–335, 431–432, 450–452, 456–458, 535–541, 561–564).

27. The Court further finds that with respect to an intended deposit, the Bank of Oklahoma would be unable to and would have no means of ascertaining or verifying either the amount of cash or the amount, genuineness and collectibility of checks so deposited, even if such CBCT were to be on line, i. e., directly connected by wire or telephone line with the computer of the Bank. (Tr. at 187–188, 282, 300–301, 431, 458–461, 542–544, 547).

28. With respect to the function of bill payment, the evidence shows the Bank is unable to and has no means of verifying or acting upon instructions of its customer until the encoded or punched tape is retrieved from the CBCT, delivered to the main banking house, read, verified, and the instructions carried out at the banking house. (Tr. at 101, 547).

## JOINT FINDINGS APPLICABLE TO ALL DEFENDANTS

29. The Court finds that the CBCTs involved in these cases are capable of performing only a small portion of the functions generally associated with banking, whether at the chartered banking house or at a branch. For example, such a CBCT:

a) Does not have any bank employee or personnel located thereat;

b) Does not handle any corporate accounts;

c) Does not and is not capable of making change or exchanging currency;

d) Does not and is not capable of paying or cashing a paper check or written order to pay, whether drawn on the individual defendant bank or upon a third party drawee bank;

e) Does not and is not capable of discounting commercial paper;

f) Does not and is not capable of executing loan agreements or other documents;

g) Does not and is not capable of exercising judgment in the extension of credit;

h) Does not and is not capable of issuing cashier's checks or money orders;

i) Does not and is not capable of certifying personal checks of the customer, or any other drawer;

j) Does not and is not capable of issuing bills of exchange;

k) Does not and is not capable of notarizing documents;

l) Does not and is not capable of issuing traveler's checks;

m) Does not and is not capable of acting as escrow agent;

n) Does not and is not capable of opening an account, either checking, savings or reserve (Master Charge, Master Reserve, or Uticash);

o) Does not and is not capable of guaranteeing signatures;

p) Does not and is not capable of selling or cashing U.S. Savings Bonds;

q) Does not and is not capable of dealing in foreign exchange;

r) Does not and is not capable of accepting or verifying loan collateral;

s) Does not and is not capable of arranging a loan participation with another bank;

t) Does not and is not capable of acting as transfer agent for stocks and bonds;

u) Does not and is not capable of providing safety deposit box service;

v) Does not and is not capable of accepting or establishing trust accounts, or acting as a trustee;

w) Does not and is not capable of purchasing Treasury Bills for a customer, or issuing Certificates of Deposit;

x) Does not and is not capable of giving financial advice;

y) Does not and is not capable of issuing letters of credit;

z) Does not and is not capable of handling customer complaints. (Leonard Dep. at 29–32; Tr. at 494–495).

30. Traditionally, branch banks are capable of and normally do perform and render the banking functions and services specified in paragraph 29 above. (See Conclusion of Law No. 8, *infra*).

31. The Court further finds that in the year 1927 at the time of the adoption of the McFadden Act, the use of electronic devices for the transmission of instructions or the making of electronic debits or credits was as unknown and as unforeseen as was our placing a man on the moon; that the banking practices of that day contemplated only the traditional paper payment system and the performance of banking functions by direct confrontation and dialogue between banking personnel and bank customers. In this connection, the Court takes judicial notice of the fact that currently where branch banking is permitted, such branches are manned and staffed by people as employees and agents of the bank and have the capability of performing all functions of the general banking business, to the extent bank management opts to conduct business at a branch. (Tr. at 155–159, 285, 433, 446, 448).

32. On December 12, 1974, the Comptroller of the Currency of the United States issued Interpretive Ruling 7.7491 (amended on May 9, 1975) containing his view that the establishment by national banks of customer-bank communication terminals (CBCTs) was necessary and incidental to carrying on the business of banking and that CBCTs did not constitute branch banking and consequently, that the establishment and operation of such terminals by national banks would not be limited by branch banking restrictions. (Stip. ¶ 26; Def. Comptroller's Exhs. A & B).

33. The Comptroller's definition of a CBCT includes any electronic communications device operated off-premises by a bank customer in order to transmit instructions to his bank regarding the disposition of funds in the customer's account and to receive responses thereto. Such devices include telephones, point-of-sale terminals, and automatic teller machines either on or off-line. By such definition, a CBCT may not employ banking personnel at the off-premises site. (Def. Comptroller's Exhs. A & B).

34. The Court finds that a CBCT is closely analogous to a mailbox or a telephone and/or telegraph, through which a customer may communicate with his bank to accomplish certain routine transactions. (Def. Comptroller's Exh. A; Tr. at 165–168, 195–197, 238, 284, 430).

35. The Court further finds that the Comptroller of the Currency; the Justice Department, Antitrust Division; Federal Home Loan Bank Board; National Credit Union Administration; Governor Mitchell of the Board of Governors of the Federal Reserve System; and the legislatures of eighteen states have all expressed similar views that CBCTs are not branches. The Court's attention has not been directed to nor is the Court aware of the act of any state legislature prohibiting CBCTs as branches. (Stip. ¶ 29; Def. Comptroller's Exhs. A–E, 2 & 3; Tr. at 413, 415–416, 426–428).

36. If among the fifty states, some state-chartered institutions are forbidden by their state governments to apply electronic technology to communications between a bank and its customers, whatever competitive disadvantage may occur will be the sort normally associated with the dual banking system. State banks, for example, may elect not to join the Federal Reserve System, and thereby frequently are permitted to keep reserves in interest-bearing notes or in correspondent bank accounts at other institutions, thus substantially reducing the cost of maintaining federal reserve accounts. State banks also sometimes are given higher lending limits or broader discretion in making loans than are national banks. In other nonbranching areas, national banks enjoy competitive advantages. These differences are inherent in a dual banking system which is fundamentally inconsistent with complete and total equality between state-chartered banks and national banks. Cf., *First National Bank of Fairbanks v. Camp*, 151 U.S.App.D.C. 1, 465 F.2d 586, 596 (1972), cert. denied, 409 U.S. 1124, 93

S.Ct. 936, 35 L.Ed.2d 255 (1973). (Leonard Dep. at 55–56; Tr. at 440–441).

37. For many years banks have conducted routine banking transactions away from bank premises, including new business solicitation, loan closings, sale of money orders and traveler's checks, banking by mail, credit card services, various correspondent services, and data processing. (Stip. ¶¶ 30, 37; Leonard Dep. at 22–23; Killmon Dep. at 23; Tr. at 104, 516–517, 525–529).

38. Any bank in Oklahoma may today purchase a complete package of on-line computer services which allow bank customers access to their bank accounts from virtually any telephone in the world. The evidence establishes that certain state-chartered banks in Oklahoma actually extend credit over the telephone. (Def. Comptroller's Exh. 5; Tr. at 183–185).

39. The Court finds from the testimony and associated exhibits of Dr. Donald P. Jacobs, Dean—Graduate School of Management, Northwestern University, Chicago, Illinois and staff director of the Presidential Commission on Financial Structure and Regulation ("Hunt Commission"), that EFT technology is a new and modern way for banks to accomplish traditional funds transfers and a more efficient and less expensive way of operating this nation's payments system. The historical development of the payments mechanism or system in this country has been from less to more efficient methods and applications of technology. Thus, currency came into use and was replaced by the use of paper drafts; paper drafts were replaced by preprinted checks; and preprinted checks are processed automatically instead of manually through the application of magnetic ink character recognition and the use of machines. No authorization from either state or federal regulatory authorities was required for the implementation of any of these innovations. The employment of computer science or electronic funds transfer technology to include CBCTs is merely another step in the application of new technology to old systems and methods. (Def. Comptroller Exh. F; Tr. at 152–168, 429–430, 442–443).

■ 40. The evolution and development of the electronic payments system in this country is critical and crucial because the traditional paper check is losing its general utility from the standpoint of both acceptance and cost of processing. From the evidence, it appears that during the year 1964 commercial banks in the United States processed 12 billion items. During 1974, this number had increased to 27 billion and projected at the historically established rate of increase of 7% annually, the volume will reach 54 billion by 1985. The defendant Bank of Oklahoma alone is handling approximately 3.8 million paper items per month, and many of these items are repeatedly handled by other banks or clearing houses. The processing of such volumes of paper checks will be increasingly costly. Moreover, the Court notes that the savings and loans, trust companies and credit unions are entering the third party payment system of this country. In addition, thrift institutions are allowed point-of-sales terminals everywhere in the country. If banks are burdened with the increasing cost of paper handling and other financial institutions are freely able to use electronic fund transfer systems with the resulting savings and efficiency, the banks will be placed at a serious competitive disadvantage, the very thing which the McFadden Act was enacted to avoid. Electronic technology offers not only decreasing costs but also greater security and efficiency of operation. (Tr. at 168–169, 179–180, 523).

41. A state bank operating in the City of Tulsa, Republic Bank and Trust Company (hereinafter "Republic"), is and has for many months past been operating an on-line remote electronic terminal, a type of CBCT, located at McCartney Food Store (hereinafter "McCartney") in the City of Tulsa, a distance of some two and one-half miles from the main banking premises of Republic. (Leonard Dep. at 84–85; Tr. at 251–252).

42. Based on the evidence, the Court finds that the terminal operation of Republic at McCartney is substantially equivalent to the withdrawal transaction as it is initiated by a Utica customer utilizing the terminal at Clarke's. Indeed, Republic refers to such operation in its instruction manual as a "withdrawal transaction." (Tr. at 252–268).

43. The Court finds further that these procedures for electronic withdrawal of funds were submitted by Republic in writing to the plaintiff Bank Commissioner prior to activation of the Republic remote terminal and were approved by the Bank Commissioner as being permissible under Oklahoma law. (Leonard Dep. at 84; Tr. at 253, 256, 263–264).

44. In addition, the Court finds that the Fidelity Bank, N.A., of Oklahoma City, since February, 1973, has been advancing funds against its customers' checking accounts, savings accounts, and Master Charge accounts at its detached "Anytime Bank" through an off-line automated teller machine that performs the identical functions and has the same capabilities as the CBCT of the defendant Bank of Oklahoma, N.A. In this connection, the Court finds that the plaintiff Bank Commissioner of the State of Oklahoma has not objected to nor taken any action to stop the said Fidelity Bank from advancing funds against its customers' Master Charge accounts at its CBCT (ATM), located off-premises from the said Bank's chartered banking house. That said practice has been uninterruptedly carried on by said Fidelity Bank for more than two and one-half years, without a complaint having been filed by any other bank in the State of Oklahoma and without any action to inhibit such practice having been taken by the Banking Commissioner, notwithstanding the fact that he is authorized under 6 O.S. § 415 to initiate legal action to enjoin a bank from making loans at such a detached facility. (Killmon Dep. at 8, 13–15, 21–22, 24, 27 and Exhs. 5 & 8 thereto; Leonard Dep. at 40–42, 44).

45. Moreover, it is a common practice in the banking business in Oklahoma for state and national banks to cash checks at a detached facility drawn by a customer on such institutions resulting in an overdraft situation. Further, it is a common practice for banks to cash such checks pursuant to a prearranged line of credit whereby funds are advanced to a customer's checking account for the purpose of funding such checks. (Leonard Dep. at 26; Killmon Dep. at 19; Tr. at 371–373, 468).

46. The Court finds that Trust Companies organized under the laws of the State of Oklahoma are expressly authorized to branch and to have branches by virtue of Oklahoma Attorney General's Opinion No. 73–274, promulgated April 24, 1974, and at least one trust company has one or more branch offices in the State of Oklahoma. (Stip. ¶ 23; Leonard Dep. at 99–100; Def. Utica's Exh. 13; Def. Bank of Oklahoma's Exh. R; Tr. at 278–279).

47. The Court further finds that trust companies chartered under Oklahoma law are authorized to and in fact perform substantially the same services as commercial banks. Such trust companies offer trust services, receive deposits in trust, and pay interest on such deposits on either a time or demand basis. Such companies may make loans of various types, may honor drafts drawn by their customers against funds on deposit, thereby offering their customers the substantial equivalent of demand checking accounts, and perform all the other services authorized by Title 6 O.S. § 1001. Further, at least two trust companies chartered under Oklahoma law are authorized under their original charters to offer conventional checking accounts. The Court finds that these deposit, loan and checking services are the substantial equivalent of those which are offered by commercial banks. (Leonard Dep. at 27–28, 71–73, 78–82; Def. Bank of Oklahoma's Exhs. P, Q, & R).

48. The Court finds that savings and loan associations have recently received considerably expanded consumer loan au-

thority, including the power to make loans on mobile homes, refrigerators, stoves, air conditioners, televisions, and similar types of consumer goods. Additionally, such associations have within the last few months been authorized to make certain limited types of unsecured loans. With the development of electronic funds transfer (EFT) technology and innovations among thrift institutions such as "NOW" accounts, national banks face intense and effective market penetration and competition by thrift institutions including savings and loan associations and credit unions, state-chartered banks in states which permit employment of CBCTs, finance companies and other financial intermediaries (e. g., credit card companies) and retail establishments (e. g., Sears Roebuck & Co., J. C. Penney Corp., and numerous grocery chains). Commercial banks, both national and state, will be severely handicapped and disadvantaged in the financial market place if they are not permitted to compete with other financial and unregulated non-financial institutions through the application of electronic technology in the delivery of financial services to customers by the use of CBCTs as an exercise of powers incidental to carrying on the business of banking. (Eaton Dep. at 21; Leonard Dep. at 57–59; Exh. 8 to Waller Dep.; Tr. at 119–120, 179–183, 202, 205–206, 213, 308, 422–424, 465–467, 545–547).

49. The Federal Home Loan Bank Board has issued a regulation (39 F.R. 23991, June 28, 1974) permitting federally-chartered savings and loan associations to establish remote service units (RSUs), and the National Credit Union Administration has similarly issued a regulation (39 F.R. 30107, August 21, 1974) permitting federally-chartered credit unions to likewise establish remote terminals. The use of these remote facilities by credit unions and savings and loan associations is not subject to branching restrictions. (Stip. ¶¶ 27, 28; Def. Comptroller's Exhs. C & D).

50. The Court finds that the following RSU (CBCT) activities are being conducted in the Tulsa area at the present time:

a) Tulsa Federal Savings and Loan Association is operating an RSU in the Southland Shopping Center which is virtually identical to Bank of Oklahoma's CBCT; (Leonard Dep. at 51–54; Ingle Dep. at 17–21, 25–28 and Exhs. 8, 12, 16, 18 & 19 thereto).

b) Seven savings and loan associations have filed a joint application with the Federal Home Loan Bank Board to install 50 RSUs in the Tulsa area and 50 RSUs in the Oklahoma City area; (Ingle Dep. at 33–36 and Exh. 25 thereto; Waller Dep. at 23–26).

c) Various savings and loan associations are offering telephone funds transfer services whereby funds may be transferred between savings and loan association accounts and commercial bank accounts; one such savings and loan association has advertised this service as follows:

"It's as though we had 179,533 branch offices to help you save."

(Ingle Dep. at 10–11, 29–30; Waller Dep. at 13–14, 22–23 and Exh. 7 thereto).

51. The use of such CBCTs by savings and loan associations and credit unions allows these thrift institutions to participate in the third-party payment system, which heretofore was the exclusive province of the commercial bank. Thrift institutions now can offer customers the conveniences of commercial bank checking accounts and at the same time pay interest on balances. (Eaton Dep. at 36–37; Tr. at 178–181, 341–342).

52. The Court further finds that the securing of deposits is a substantial and vital requirement for the success of banks, both state and national; that all financial institutions, including trust companies, savings and loan associations, savings banks, credit unions, and state and national banks, are in direct competition each with the other to obtain the public's deposit dollars; that savings and

loan associations, trust companies, and credit unions have heretofore in fact established and are now maintaining branches within the State of Oklahoma and are presently permitted to branch by the regulatory officials of the State of Oklahoma. (Eaton Dep. at 50; Def. Utica's Exh. 13; Def. Bank of Oklahoma's Exh. R; Tr. at 119, 146, 182–183, 249–250, 278–280).

53. The Court finds from the evidence and takes judicial notice of the fact that customer convenience is one of the most important elements involved in the competition among financial institutions for the public's deposit dollars; that the use of CBCTs provides such a substantial customer convenience to the general banking public. (Eaton Dep. at 20–21; Tr. at 118, 121, 140, 291–292).

54. With the advent of the authority of savings and loans to offer accounts whereby a customer may, by telephone or through other types of RSUs, transfer funds from his savings account to his bank checking account, and vice versa, and with their expanded loan powers, the Court finds that savings and loan associations may now offer substantially the same deposit, loan, and checking services as do commercial banks. (Def. Bank of Oklahoma's Exh. K–10; Leonard Dep. at 57–59; Tr. at 178–181, 236–237, 341–345).

55. Plaintiff has failed to demonstrate that it has or will suffer an irreparable injury as a result of the operation of defendant banks' CBCTs. Indeed, plaintiff's allegations that banks will migrate from the state system to the national system to gain competitive parity, thus destroying the dual banking system, or that the state's capacity to regulate state-chartered banks is impaired, remain unsubstantiated conjecture. (Tr. at 118, 144, 309–310, 503).

56. The application of EFTS technology, including CBCTs, to commercial banking will increase convenience in offering limited bank services to customers; increase the efficient operation of banks; decrease the cost of bank operations and cost of money to the consumer; increase competition among financial institutions; and substantially decrease losses resulting from "bad checks". (Tr. at 168–169, 173–179, 421).

57. Small banks will enjoy the benefits of the application of EFTS technology to commercial banking as well as large banks. Uncontroverted testimony was adduced that point-of-sales terminals may be purchased for less than $1500 per unit and may be rented at a still lower cost. In this connection, Dean Donald P. Jacobs testified that " . . . the telephone company would in effect move along its technology, and has demonstrated that it is moving its technology, to upgrade the touch-tone telephone to be a basic point-of-sale terminal . . ." [2] Because of economies in operation, small banks may well be the greatest beneficiaries of EFTS and CBCTs. (Tr. at 166, 174–75, 183–186, 192–193, 219–220, 499).

58. The use of CBCTs by banks is necessary and essential for overall utilization by this country's payment system of electronic technology because the CBCT is the terminal point at which input and output of data with respect to funds transfers is possible. The use of an electronic impulse is more convenient than a customer's checkbook and a mailbox. (Tr. at 160, 218).

59. Moreover, the plaintiff Bank Commissioner of Oklahoma has stated that if this Court concludes that CBCTs are not branches and may lawfully be utilized by national banks, he will permit state banks to also use CBCTs. This statement has been officially adopted by the State Banking Board of Oklahoma. (Stip. ¶ 24; Def. Utica's Exh. 15; Leonard Dep. 9–11; Tr. at 103). The evi-

2. The Court notes in passing that subsequent to the close of evidence, it came to the Court's attention that the Bell System (AT&T Co.) is apparently advertising for general distribution just such an instrument, which it refers to as a Bell System Transaction telephone. See advertisement attached hereto from "The Wall Street Journal," 9 December, 1975.

dence also reveals that plaintiff State Bank Commissioner regulates not only state-chartered commercial banks but all state-chartered financial institutions including savings and loan associations, trust companies, and credit unions (Tr. at 312); that the plaintiff Commissioner sought an opinion of the State Attorney General only as to whether CBCTs are permissible in Oklahoma for state-chartered commercial banks, while allowing other state-chartered financial institutions to establish CBCTs freely without restricting them as branches. (Leonard Dep. at 60–66; Tr. at 327–329). Furthermore, the Commissioner testified that he is in favor of recommending to the state legislature that all state-chartered financial institutions be permitted to establish CBCTs.[3] Thus, the Bank Commissioner has chosen different courses of action with regard to banks and the other financial institutions he supervises in determining whether or not CBCTs constitute branches, resulting in less than even handed application of the law. The inconsistency of the Bank Commissioner's position is further demonstrated by the allegations in his Complaint that the CBCTs involved in these cases perform the functions of receiving deposits, paying checks and loaning money, and yet his testimony is that he is not really concerned with the *functions* performed by bank CBCTs but rather with *access*[4] to such CBCTs.

60. The Court finds that if commercial banks are not permitted to utilize CBCTs, they will be denied the savings in costs, streamlined record-keeping and other economies which result from EFTS; they and their business customers will continue to incur "bad check" losses, stolen check losses, and the other burdens of a paper-based system dependent on the mails for transfer of funds, all of which could be avoided by EFTS. (One bank alone, New York's First National City Bank, loses 7,000 checks per day. Def. Comptroller's Exh. 2, p. 27). If banks are not permitted to change with the times and meet their customers' needs at the lowest cost, the ultimate loser will be the consumer, who will be forced to bear the increased costs of inefficient operation. A further loser will be commercial banks as a class, which will be denied the right to compete on an equal basis with thrift institutions that have free access to EFTS. Competition is the genius behind the American experience, and competitive equality is the policy which underlies the branching provisions of the McFadden Act. It is the duty of this Court to ascertain the legislative intent and, having done so, to implement such intent to meet the ever-changing environment produced by technological advances. To give the McFadden Act a restrictive meaning and deny to commercial banks the use of the pro-competitive, efficient, and cost-saving

---

3. At page 331 of the Transcript appears the following colloquy with the Bank Commissioner:

"COURT: Let me ask you one more question. If you had your choice and you could tell the legislature, realizing the times as they are, would you recommend to the legislature that all facilities be allowed to have these devices in view of the energy crunch, and other things coming up?
A. And take advantage of this electronic knowledge?
COURT: For all institutions?
A. *You bet, I would be the ringleader.*" (Emphasis supplied)

4. At pages 388 and 389 of the Transcript appears the following testimony by the Bank Commissioner:

" . . . Suppose all of the banks in Tulsa had access to that unit, did I understand your testimony to be that if all banks could use this unit, or the customers of all banks, put it that way, that that would not be a branch?
A. No, I wouldn't consider that to be a branch if all customers could use it . . .
Q. *Isn't it true then it doesn't make any difference what the function is, if everybody can have access to it at the same place, then it is not a place of business of one bank, it is a financial center for all people to go to?*
A. *That's right.*
Q. *And you would not consider that to be a branch?*
A. *No, . . .* " (Emphasis supplied)

EFTS would actually be at odds with the purpose and intent of the McFadden Act.

## CONCLUSIONS OF LAW

Based on the foregoing findings of fact, the Court concludes as a matter of law:

1. Plaintiff has failed to establish any injury in fact.

2. 12 U.S.C. § 24 Seventh provides that national banks may exercise all such incidental powers, express or implied, as are necessary to carry on the business of banking.

■ 3. Communication between a national bank and its customers via CBCTs is the exercise of a power necessary and incidental to carrying on the business of banking.

4. The threshold question is whether a CBCT is a "branch bank, branch office, branch agency, additional office, or any branch place of business . . . at which deposits are received, or checks paid, or money lent," within the meaning of the McFadden Act, 12 U.S.C. § 36(f).

■ 5. Construction of the term "branch" under the McFadden Act is purely a matter of federal law. *First National Bank in Plant City v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969). The definitions in 12 U.S.C. § 36(f) cannot be varied by state law, but instead constitute in themselves the test to be applied in the first instance to determine the extent to which state law is to be permitted to operate upon national banks in contravention of the National Bank Act's general supremacy over state law. See *e.g., Tiffany v. National Bank of Missouri*, 18 Wall. 409, 21 L.Ed. 862 (1874); *Easton v. Iowa*, 188 U.S. 220, 23 S.Ct. 288, 47 L.Ed. 452 (1903). Thus, the resolution of whether a CBCT is a branch for purposes of federal law should be the same, for example, in California, which permits statewide branch banking, as in Oklahoma, which prohibits branch banking. (The Court notes in passing that the definition of "branch" under 6 O.S. §§ 501

and 2061 is identical to that contained in 12 U.S.C. § 36(f).)

■ 6. The McFadden Act should be construed in a manner which promotes, and not restrains, competition. *United States v. Philadelphia National Bank*, 374 U.S. 321, 372, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

■ 7. Anti-branching laws are unambiguously calculated to prevent competition. *United States v. Citizens and Southern National Bank*, 422 U.S. 86, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975).

■ 8. The Court, faced with the difficult task of applying a 50-year old statute to an industry undergoing a great change as a result of modern electronic technology, recognizes that administrative interpretation, as expressed in the Comptroller's Interpretative Ruling 7.7491, as amended, should be given substantial weight in its construction of the McFadden Act. *Lincoln Bank & Trust Co. v. Exchange National Bank*, 383 F.2d 694, 700 (10th Cir. 1967). See also, *Unemployment Commission v. Aragon*, 329 U.S. 143, 153, 67 S.Ct. 245, 91 L.Ed. 136 (1946); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Investment Company Institute v. Camp*, 401 U.S. 617, 626, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); 67 Cong.Rec. 1860 (1926). In addition, it is incumbent upon this Court to review the legislative history of the McFadden Act; and in this connection the Court takes judicial notice that electronic funds transfer systems, such as CBCTs, were unknown in 1927, and therefore could not have then been conceived or within the contemplation of Congress. On the contrary, a review of Congressional debate discloses that branches as "then conceived" by the Congress were separate and complete banking establishments, staffed by people, where general banking business was conducted. 67 Cong.Rec. 2860 (1926); 67 Cong.Rec. 3230 (1926); 66 Cong.Rec. 2830 (1926); 66 Cong.Rec. 1778 (1925); and 66 Cong.Rec. 1775 (1925).

■ 9. The Court is aware of differing opinions expressed by Federal Dis-

trict Courts attempting to resolve issues similar to those involved in this action. Although the evidence discloses some differences of opinion as to what is a branch, when a deposit is received, checks paid, and money lent, this Court after carefully weighing the testimony of many highly qualified expert witnesses and analyzing the reasoning supporting the contra view, concludes as a matter of law:

a) That the CBCTs involved in this action do not constitute a "branch bank, branch office, branch agency, additional office or any branch place of business" within the meaning of the McFadden Act. Under the doctrine of ejusdem generis, any "additional place of business" refers to "places" like "office" or "agency" which clearly connote a place staffed by bank personnel who conduct the bank's business at such a place. No other meaning could have been in the contemplation of the Congress at the time of the enactment of the McFadden Act.

b) Even if the subject CBCTs were to be considered a "branch place of business", the Court is persuaded from the testimony of reliable and knowledgeable witnesses, such as Dr. Donald P. Jacobs, Dean, Graduate School of Management, Northwestern University; Russell C. Browne, Representative to the National Electronic Funds Transfer Commission; Wesley R. McKinney, President and Chief Executive Officer of a state chartered bank; and Morrison Tucker, Chief Executive Officer and/or Director of five state chartered banks in Oklahoma and a very recent past-president of the Oklahoma Bankers Association, that:

(i) With respect to the making of deposits, within the banking industry a deposit is not "received" until the items tendered for deposit have been actually counted or verified, credited to the account of the depositor, and thus available to the bank for its use as well as available to the customer for withdrawal. Accordingly, the Court concludes that deposits are not received at the location of defendant banks' CBCTs.

(ii) With respect to the paying of checks, the plastic card and personal identification number used in conjunction with the card to activate the defendants' CBCTs are not "checks". They do not meet the statutory definition of a check contained in the Uniform Commercial Code, nor are they written instruments such as were contemplated by the McFadden Act. The word "check" has a well-defined and precise meaning in the commerce of this country; indeed, "a check is foreign to the electronic environment" or CBCT. From the evidence, such a check is not *paid* as distinguished from *cashed* until it is presented to the drawee bank, verified as to amount and genuineness, the account balance is found sufficient, the amount of the check is debited, photographed and stamped "paid", or otherwise cancelled, and the check's use in commerce is thus terminated. Under the evidence in this case, such paying occurs at the chartered premises of defendant banks and therefore the Court concludes that no checks are paid at the defendants' CBCTs.

(iii) With respect to the lending of money, the Court concludes from the facts disclosed by the evidence and from common knowledge that the making of a loan requires the exercise of the personal judgment of a bank officer based upon credit evaluation. Terms must be negotiated and agreed to, prior to disbursement by the bank of the loan proceeds. The making of a loan is the creation of an obligation of the bank to disburse and the obligation of the borrower to repay any funds advanced which occurs at the time the terms are negotiated and instruments evidencing those terms are executed. A loan is not made at the location where only the proceeds of the loan are advanced. This conclusion is applicable to all extensions of credit including conventional loans, advances against master charge accounts,

and overdraft privileges attached to checking accounts. In this regard, the operation of a CBCT to advance cash is analogous to a customer receiving funds advanced upon a bank-issued letter of credit. Accordingly, the Court concludes that a loan is not made at the location of defendant banks' CBCTs within the meaning of the McFadden Act.

c) The above conclusions apply with equal force to a CBCT which is "on line" such as Utica's POS and Bank of Oklahoma's ATM when it is put "on line", as is contemplated by the defendant Bank of Oklahoma. All banking transactions initiated by instructions transmitted through such CBCTs are consummated at the chartered banking premises by transfers of funds between accounts maintained in the banks' computers located on their chartered banking premises.

■ 10. Clarke's is not a branch bank, branch agency, branch office or branch place of business of Utica within the meaning of the McFadden Act.

11. Clarke's is not engaged in the banking business.

12. Clarke's is not an agent or agency of Utica.

13. The determination by the United States Supreme Court in *Plant City* that deposits were taken by a national bank off-premises is limited to the facts which were before the Court in that case and which are plainly distinguishable from the facts before this Court.

14. Oklahoma Attorney General's Opinion No. 75–299 dated July 11, 1975, is a clearly erroneous interpretation of applicable law and of no force and effect. The CBCTs involved in this case are not branches within the meaning of 12 U.S.C. § 36(f) or 6 O.S. §§ 501 and 2061.

15. The defendants have plead and strenuously urged the affirmative defense [5] that interpreting the McFadden Act and 6 O.S. §§ 501 and 2061 to prohibit CBCTs as branches would violate equal protection of the laws as guaranteed by the 14th Amendment of the United States Constitution and the due process clause of the Oklahoma Constitution. While the Court recognizes that there is considerable evidence in the record supporting this position, it is unnecessary to rule on this defense at this time in view of the Court's determination that CBCTs are not branches of national or state banks. The Constitutional question, and the other affirmative defenses raised by the defendants, are therefore reserved and specifically not passed upon at this time.

16. It is therefore the conclusion of the Court that Judgment should be rendered for the defendants and against the plaintiff, and these consolidated actions dismissed on the merits with prejudice.

---

**5.** Although not ruling on this affirmative defense, as well as the other affirmative defenses raised by the two defendant banks, from all the evidence, testimony and documents introduced in this case, the Court makes the following observations:

This Court is constrained to look through form to substance. *First National Bank in Plant City v. Dickinson,* 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969). The Court feels that under all of the evidence in this litigation, if other financial institutions in this State are allowed by the State Banking Commissioner to engage in the use of CBCTs but they are prohibited to the defendant banks, it would create, no doubt, unfair treatment, inequity, and an undue hardship on the banks. This is particularly so in view of the operations conducted by Republic and Fidelity; in view of Oklahoma Attorney General Opinions No. 73–274 (authorizing trust companies to branch) and No. 65–283 (authorizing off-premises depositories and armored car delivery services); in view of the Bank Commissioner's testimony that he does not object to pure point of sale CBCTs; in view of the fact that overdraft checks are regularly honored at detached facilities by state and national banks, both with and without prearranged lines of credit, and that extensions of credit are made by telephone; and in view of other banking practices commonly employed in the State of Oklahoma. The Court observes that the distinctions sought to be drawn by the Attorney General of Oklahoma and the Bank Commissioner between the defendants' CBCTs and the activities being permitted in Oklahoma, are apparently distinctions without a difference. The

APPENDIX

THE WALL STREET JOURNAL
Tuesday December 9 1975   21

# This telephone
# gives your customers the credit they deserve.

If your business involves check or credit card transactions, you need the Bell System's Transaction* telephone.

It's like having two telephones in one: a regular telephone for normal calls, plus a phone with special features that allow it to function as a check verification and credit authorization terminal.

For instance, if you're a banker, the Transaction telephone can serve as a teller terminal to increase the speed and security of your check cashing and bank card operations.

Or as an account inquiry terminal where customers can get their account balances in seconds, instead of standing in line for ages.

If you're a retailer, it can save you money on bad checks and stolen credit cards.

And while it's helping to cut your losses, the Transaction telephone can also increase efficiency. There are sequential instruction lights to guide the user through the input procedure. So it's fast and simple to operate.

The Transaction telephone is another part of the Bell System's commitment to meeting your business communications needs. And like all of our products, it's backed 100% by the Bell System.

For the surprisingly low cost and complete details, contact your Bell Account Representative.

*Trademark of AT&T Co

 **Transaction Telephone from the Bell System**

---

doctrine of competitive equality requires that a national bank not be denied ". . . privileges which the State is allowing other institutions to exercise" *Lincoln Bank & Trust Co. v. Exchange National Bank,* 383 F.2d 694, 700 (10th Cir. 1967).

The Court makes these observations after having determined the main thrust of the plaintiff's contention adversely to plaintiff, such determination being dispositive of the litigation; namely, that CBCTs do not constitute branch banks.